**IT IS ORDERED as set forth below:**

**Date: August 15, 2022**

_____

**Jeffery W. Cavender
U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| IN RE: <br> TOWANDA BRAXTON, <br> Debtor. | CASE NO. 19-55269-JWC <br> CHAPTER 7 |
| MICHAEL WAGONER, <br> Plaintiff, <br> v. <br> TOWANDA BRAXTON, BIG TOE, INC., T. BRAXTON BEAUTY SUPPLY COMPANY, LLC, and DOE DEFENDANTS 1-3, <br> Defendants. | ADVERSARY PROCEEDING NO. <br> 19-5235-JWC |

## Order on Motion for Summary Judgment

Before the Court is Plaintiff Michael Wagoner's Motion for Partial Summary Judgment (Doc. No. 95) (the "Motion") against Defendant Towanda Braxton ("Debtor"). Wagoner

1

requests summary judgment denying Debtor a discharge pursuant to 11 U.S.C. § 727(a)(2)-(5),[1] arguing Debtor made numerous misrepresentations in her schedules, transferred and concealed assets, failed to maintain records to ascertain her financial condition or business transactions, and failed to satisfactorily explain losses or deficiencies of assets. Debtor filed no response to the Motion or to Wagoner's Statement of Undisputed Material Facts as to Which There Is No Genuine Issue to Be Tried (Doc. No. 95-2) (the "Statement of Facts" or "SOF"). The Court considers the Motion unopposed, *see* BLR 7007-1(c), and deems each fact in the Statement of Facts to be admitted, *see* BLR 7056-1(a)(2). Given the lack of response by Debtor and deemed admissions in the Statement of Facts, the Court will grant the Motion for the reasons discussed below.

## I.  JURISDICTION

The Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).

## II.  STANDARD OF REVIEW

Federal Rule 56, applicable through Bankruptcy Rule 7056, allows the Court to enter summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918-19 (11th Cir. 1993).

A fact is material if it might affect the outcome of a proceeding under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A dispute of fact is

---

[1] All references and citations to a statute are to Title 11 of the United States Code (the "Bankruptcy Code") unless otherwise specified. All references or citations to a "Federal Rule" are to the Federal Rules of Civil Procedure. All references or citations to a "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

2

genuine "if the evidence is such that a reasonable jury [or fact finder] could return a verdict for the nonmoving party." *Id*.

At the summary judgment stage of a proceeding, the Court's function is not to determine the truth of the matter by weighing the evidence, but rather to determine if there is a genuine issue for trial. *Id.* When making this determination, the Court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir. 1985). "All reasonable doubts and inferences should be resolved in favor of the opponent." *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502 (11th Cir. 1985).

The moving party bears the burden of establishing the right to summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Clark v. Union Mut. Life Ins. Co.*, 692 F.2d 1370, 1372 (11th Cir. 1982). The moving party must identify those evidentiary materials listed in Federal Rule 56(c) that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(e).

Once the moving party makes a *prima facie* showing of its entitlement to judgment as a matter of law, the nonmoving party must go beyond the pleadings and demonstrate that a material issue of fact precludes summary judgment. *Celotex*, 477 U.S. at 324; *Martin v. Commercial Union Ins. Co.*, 935 F.2d 235, 238 (11th Cir. 1991). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citations omitted).

### III.    UNDISPUTED MATERIAL FACTS

In a 2018 consent judgment, Debtor agreed to pay Wagoner over $76,000. (SOF ¶ 2).

Debtor breached the terms of the consent judgment, Wagoner began collection efforts, and Debtor filed bankruptcy on April 2, 2019. (SOF ¶¶ 3-4). Debtor's statement of financial affairs claims no income of any kind in the two years prior to the petition date. (Bankr. Doc. No. 1, p. 8).[2] Debtor's Schedule I and other documents included with her petition, however, show Debtor to be self-employed by T. Braxton Beauty Company, LLC ("TBBC") and indicates $4,692 of net monthly income from the operation of a business for the six months prior to the bankruptcy filing. (Bankr. Doc. No. 1, pp. 30-31). Contrary to the instructions on Schedule I, Debtor attached nothing to her schedules showing gross receipts, ordinary and necessary business expenses, or how the net income from operation of a business was derived on Schedule I. *Id.* Debtor's schedule J shows estimated average monthly expenses of $6,020. (Bankr. Doc. No. 1, pp. 32-33). Debtor currently pays her bills with cash her friends and family give her, but she keeps no records of cash she receives. (SOF ¶¶ 64, 67, 82). She is not able to estimate how much cash friends and family give her per month. (SOF ¶ 65, Dep. Tr. 14:13-17).[3] She either deposits money into her personal checking account or pays bills directly with cashier's checks or money orders. (SOF ¶ 64, 81). She does not keep records of expenses. (SOF ¶ 64, 85-86, 89). In the past, Debtor also deposited personal income into and paid personal expenses from bank accounts in the names of two entities she owned: Big Toe, Inc. ("Big Toe") and TBBC. (SOF ¶¶ 21, 23, 36-39, 45, 50).

Debtor was the sole owner of Big Toe (SOF ¶¶ 71), which Debtor's former accountant set up in 2011 "for entertainment purposes." (Dep. Tr. 35:8-11). Debtor explained that "when you're in the entertainment industry you are advised to set up a business," but Debtor does not

---

[2] Citations to "Bankr. Doc. No. __" are to docket entries in Debtor's underlying bankruptcy case, Case No. 19-55269.

[3] Citations to "Dep. Tr. _:_" are to the excerpts of the Deposition of Debtor taken June 23, 2021 attached to the Statement of Facts.

know the purpose of the business. (Dep. Tr. 35:7-24). Beginning in 2011, Debtor sent her income from entertainment work to her accountant, who put the money in a bank account in Big Toe's name, but which Debtor called "my account." (SOF ¶ 37; Dep. Tr. 41:16-25). Debtor used funds from the Big Toe account to pay living expenses, but she considers all her living expenses to be business expenses because she is "a walking billboard." (SOF ¶ 56-59; Dep. Tr. 180:22-24). Debtor has little knowledge of how Big Toe operated or its purpose, and she relied on her former accountant to run Big Toe. (Dep. Tr. 35:7-24). Her former accountant, however, died a few months prior to the bankruptcy case, and he stopped handling Debtor's entertainment income at some point prior to his death. (Dep. Tr. 36:4-19; 69:8-12). Big Toe stopped "doing business" at some point before July of 2018, though Debtor could not recall when. (Dep. Tr. 145:5-17). Debtor could not recall if she ever received any distributions from Big Toe. (Dep. Tr. 36:23-24). Debtor could not recall whether Big Toe had any income or sales. (Dep. Tr. 34:23-35:3; 39:10-23). Debtor could not recall when Big Toe was last operational. (Dep. Tr. 39:22-23). Debtor kept no corporate records for Big Toe. (SOF ¶ 49, 87). Debtor dissolved Big Toe in August of 2019. (SOF ¶ 72). Debtor did not disclose any ownership in Big Toe in her schedules, statement of financial affairs, or other documents filed with her petition. (SOF ¶¶ 69-70, 73; Bankr. Doc. No. 1).

Debtor owns at least 50% of the other entity: TBBC. (SOF ¶¶ 24). While Debtor's statement of financial affairs includes a disclosure that she was a member of TBBC within the 4 years prior to her petition date, Schedule A/B does not disclose any interests in TBBC or any LLC or other corporate entity. (Bankr. Doc. No. 1, pp. 13, 17). According to Debtor, Adam Tran is the other 50% owner of TBBC. (SOF ¶¶ 24; Dep. Tr. 25:16-20). Debtor, however, has little information about Tran. They met on Instagram, and Debtor does not know where Tran

5

lives. (SOF ¶¶ 24; Dep. Tr. 25:21-26:3). While Debtor could contact Tran in the past through social media and email, those accounts are no longer active, and Debtor no longer has any ability to contact Tran. (SOF ¶¶ 24; Dep. Tr. 27:6-22, 31:16-23). There is no documentation showing Tran's 50% interest in TBBC, only a "verbal agreement that we had on Instagram." (SOF ¶¶ 24; Dep. Tr. 26:20-27:2). TBBC's business was nail polish and gels (Dep. Tr. 35:4-7), but it is unclear if TBBC ever had any inventory. (Dep. Tr. 31:1-18). Debtor testified that gels were produced, but her understanding from Tran was that there were no sales. (Dep. Tr. 31:1-18). Debtor did not know what happened to any product that may have been produced but not sold, and she lost contact with Adam Tran. (Dep. Tr. 31:1-23). Debtor never paid any money to Tran. (Dep. Tr. 31:24-25).

Although Debtor owns only 50% of TBBC, Debtor used TBBC's bank account to deposit her entertainment income and pay her personal expenses, though Debtor's testimony on these points changed. At one point she testified that all her entertainment income went to Big Toe through her former accountant. (Dep. Tr. 41:11-42:3). At a different point, she testified that some income went to Big Toe, some went to TBBC, and some went to her personally depending on the situation. (Dep. Tr. 175:7-22). Her testimony about payment of personal expenses from TBBC also changed. At one point, in response to a question of whether she used the TBBC bank account to pay personal expenses, she responded, "No. Not that I recall." (Dep. Tr. 34:15-20). At another point, however, she testified that she was using money in the TBBC account to pay personal bills at the time of the consent judgment with Wagoner in 2018. (Dep. Tr. 72:22-73:1).

According to Debtor's testimony and interrogatory responses, TBBC never had any income. (SOF ¶¶ 28-30). Nonetheless, between July of 2018 and April of 2019, TBBC's bank account received over $315,000 in deposits, including $48,345 in the month of April 2019, the

6

very month Debtor filed bankruptcy. (SOF ¶ 26 and attached bank statements). The ending balance on April 30, 2019, was $1,025.37. *Id.* Debtor kept no records of expenses and has no way to tell what any expenses paid from TBBC accounts were. (SOF ¶ 89). When asked whether the TBBC bank account "had a lot of money that came in and out of it," Debtor responded, "I don't recall." (Dep. Tr. 34:9-11). When asked whether "thousands of dollars came in and out of that bank account," Debtor responded, "Possibly." (Dep. Tr. 34:12-14). TBBC is still in existence, but Debtor keeps no apparent records for TBBC. Debtor recently renewed TBBC's registration with the Georgia Secretary of State. (Dep. Tr. 134:18-23).

## IV. CONCLUSIONS OF LAW

Bankruptcy Code § 727(a) provides, in relevant part,

> The Court shall grant the debtor a discharge, unless . . .
>
> (3) the Debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.
>
> . . . .
>
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities

The Court finds Wagoner satisfied his burden of establishing his entitlement to an order denying the Debtor a discharge under both 727(a)(3) and (5).

### A. Debtor Failed to Keep Adequate Records

"[A] party objecting to a bankruptcy discharge petition [under § 727(a)(3)] must make an initial showing that (1) the debtor failed to keep and preserve adequate financial records, and (2) such a failure makes it impossible to ascertain the debtor's financial condition." *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 354 (4th Cir. 2007). "The essential

7

requirement of § 727(a)(3) . . . [is] that the records 'sufficiently identify the transactions so that intelligent inquiry can be made of them. The test is whether there is available written evidence made and preserved from which the present financial condition of the bankrupt, and [her] business transactions for a reasonable period in the past may be ascertained.'" *In re French*, 499 at 355 (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992)). If the objecting party makes such an initial showing, the burden shifts to the debtor to show the failure keep or maintain records was justified under the circumstances of the case. *Walz v. Smith (In re Smith)*, 592 B.R. 390, 398 (Bankr. N.D. Ga. 2018).

Wagoner established that Debtor failed to keep or preserve adequate records related to Big Toe, TBBC, and her personal finances. The evidence demonstrates Debtor kept virtually no records of any kind related to her financial condition and business transactions. Indeed, the record demonstrates Debtor structured her finances in a way to leave no paper trail other than bank statements, and Debtor's memory offers little assistance. Regarding Big Toe, Debtor kept no records and could not recall whether Big Toe had any assets or income, when it was last operational, or whether she ever received distributions. Further, she could not explain its purpose other than "for entertainment purposes" on the advice of her accountant. As for TBBC, Debtor again has no meaningful records and knows only slightly more about its purpose and some of its history. What little information Debtor does recall only highlights the lack of record-keeping. For example, Adam Tran allegedly owns 50% of TBBC, but no documentation exists establishing such an interest because the agreement was made verbally on Instagram. Debtor no longer has any way to contact Tran and does not know where he lives. Products may have been developed at some point for TBBC, but Debtor has no record of such products, no knowledge or records of any sales or income, and no idea what became of any products because she lost

contact with Tran. With respect to her personal finances, Debtor keeps no records of income or expenses and pays personal living expenses with cash received from friends and family. Though she appears to deposit some cash into a personal checking account and pays some expenses from that account, Debtor also pays bills or expenses in cash or money orders and keeps no record of the cash received or expenses paid. Debtor also deposited significant sums of personal income into, and paid significant amounts of personal expenses from, bank accounts in the name of Big Toe and TBBC for years prior to her bankruptcy case. In the case of TBBC, that practice continued through the petition date. Debtor has no apparent records to keep track of this commingling of business and personal funds. Though consumer debtors generally need not keep much more than "at most, a collection of bills, receipts and canceled checks," 6 COLLIER ON BANKRUPTCY ¶ 727.03[3][g] (Levin & Sommer eds., 16th ed.), Debtor did not even keep bills and receipts. More important, most consumer debtors do not own multiple corporate entities used as conduits for their personal finances. Whatever minimal level of record keeping might be adequate for a debtor's wholly- and half-owned LLCs used to manage personal income and expenses for years, it cannot be "none."

Wagoner also established the lack of records makes it impossible to ascertain Debtor's financial condition or her business transactions. Based on the record before the Court, it is impossible to know whether Big Toe or TBBC ever had any assets or legitimate business purposes or were merely corporate shells used to funnel Debtor's personal finances. Though Debtor may have intended TBBC to be a nail polish and gel business, no evidence or record of that business exists. If either TBBC or Big Toe ever had assets, Debtor's lack of record keeping makes it impossible to know what became of them.

Regardless of whether Big Toe and TBBC ever had legitimate business purposes, Debtor used both to manage substantial amounts of personal income and expenses, and both are vitally important to understanding Debtor's financial condition and business transactions for many years prior to and up through the day she filed bankruptcy. Although Big Toe may have stopped "operations" a few months prior to the bankruptcy case after the death of Debtor's former accountant, it was active for long enough and close enough in time to the bankruptcy filing to fall comfortably within "a reasonable period in the past" for purposes of 727(a)(3). As for TBBC, Debtor claimed in Schedule I that she was self-employed by TBBC and received approximately $28,155 of business income in the 6 months prior to the petition, but no records substantiate that claimed income amount, and Debtor offered no explanation. Despite Debtor's testimony that TBBC had no income, TBBC had over $315,000 deposited into and spent from its bank account between July 1, 2018 and April 30, 2019, including over $148,000 in the 6-month period during which Debtor claimed only $28,155 of income from TBBC. Debtor likewise offered no explanation for the over $48,000 deposited into the account during the very month Debtor filed bankruptcy. How are creditors to reconcile those deposits with alleged average monthly income of $4,260 with no records tracking any of it? Whatever the explanation might be, apparently no records exist to support any explanation, and it is impossible to know based on the record before the Court. Wagoner met his burden to show both a lack of adequate record keeping and that the lack of records makes it impossible to determine Debtor's financial condition and business transactions as of the petition date.

The burden then shifts to Debtor to provide a justification for the complete lack of record-keeping under the circumstances of the case, but Debtor has not responded to the Motion,

and the Court sees no reasonable justification in the record.[4]  Accordingly, the Court will grant summary judgment denying Debtor a discharge pursuant to § 727(a)(3).

### B. Debtor Failed to Explain the Loss of Funds in TBBC's Bank Accounts

Even if Debtor could justify her failure to maintain records, she failed to satisfactorily explain what happened to $315,000 deposited into TBBC's bank account in the nine months prior to her petition.  "Section 725(a)(5) is broad enough to include any unexplained disappearance or shortage of assets."  6 COLLIER ON BANKRUPTCY ¶ 727.08.  Once the objecting party "meets the initial burden by producing evidence establishing the basis for his objection, the burden shifts to the debtor to explain satisfactorily the loss."  *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 919 (11th Cir. 1984).

Wagoner established the deposit of over $315,000 into TBBC's bank account despite testimony and interrogatory responses that TBBC had no income, sales, or assets of its own.  Wagoner also established that Debtor used TBBC's bank account to deposit personal income and pay personal expenses.  Debtor's schedules claim $6,020 of estimated monthly expenses, which totals only $54,180 of expenses over 9 months.  Even after deducting $48,000 deposited in April 2019 (assuming all those funds were deposited post-petition), that leaves roughly $207,000 spent from TBBC's bank account in the 8 months prior to the petition date that is not explained by Debtor's bankruptcy disclosures or her testimony.  TBBC and Debtor have no records to explain or justify how that money was spent, and Debtor either cannot or will not offer any explanation.  When asked whether significant sums of money were moving through the TBBC bank account in the months prior to her petition, Debtor responded, "I don't recall" and "possibly."  Without any

---

[4] While it is understandable that Debtor relied on an accountant to manage Big Toe, and his death may have caused a loss of knowledge associated therewith, debtors are ultimately responsible for maintaining records, and no reasonable explanation exists for Debtor's complete inability to produce records or even explain the purpose of Big Toe, its assets, its income, its expenses, and its operation.  Moreover, there is no similar justification for TBBC.

11

evidence or testimony explaining how the income and expenses belonged to TBBC, the only explanation apparent from the record is that Debtor grossly misstated her income and expenses by classifying hundreds of thousands of dollars of personal income and expenses as business income and expenses. That is not a satisfactory explanation. If there is some other reasonable explanation, Debtor failed to provide it. Accordingly, the Court finds Wagoner satisfied his burden to show denial of Debtor's discharge is warranted pursuant to § 727(a)(5).

## V. CONCLUSION

For the foregoing reasons,

IT IS ORDERED that the Motion is GRANTED pursuant to 11 U.S.C. § 727(a)(3) and (5). The Court will enter a separate judgment upon final resolution of the remaining claims in this case.

IT IS FURTHER ORDERED that Wagoner must file on the docket within 30 days of the date of entry of this Order a statement indicating whether he intends to pursue all remaining claims at trial. If Wagoner intends to pursue his remaining claims, the Court will schedule a status conference to address scheduling and other pre-trial matters. If Wagoner does not intend to pursue his remaining claims, or if no statement is filed within 30 days, the remaining claims may be dismissed without further notice or hearing.

The Clerk is directed to serve this Order on Plaintiff's counsel or record, Debtor, and Debtor's counsel of record

END OF DOCUMENT